# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
## CEDAR RAPIDS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | | |
| Plaintiff, | | No. 06-CR-162-LRR |
| vs. | | |
| LAMONT WILLIAM PAPAKEE and | | **ORDER** |
| CONNIE FRANCES BLACKCLOUD, | | |
| Defendants. | | |

_____

## *TABLE OF CONTENTS*

I.     INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
II.    PROCEDURAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
III.   PRINCIPLES OF JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
      A.      18 U.S.C. § 1153 (Indian Major Crimes Act) . . . . . . . . . . . . . . . 3
      B.      18 U.S.C. § 1151 (Definition of "Indian Country") . . . . . . . . . . . 4
IV.   JUDGE OR JURY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
V.     FACTUAL FINDINGS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
      A.      History of the Settlement to 1978 . . . . . . . . . . . . . . . . . . . . . . . 8
      B.      History of the Settlement after 1978 . . . . . . . . . . . . . . . . . . . . 10
VI.   ANALYSIS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
      A.      The Settlement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
           1.     Informal Reservation Status . . . . . . . . . . . . . . . . . . . . . . 13
           2.     Licklider . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
           3.     The Youngbear cases . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
                 a.     Youngbear I . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
                 b.     Youngbear II . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
                 c.     Youngbear III . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
                 d.     The importance of the Youngbear cases . . . . . . . . . 18
           4.     Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
      B.      315 Red Earth Drive . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
VII.   DISPOSITION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

## I. INTRODUCTION

In this case, the court must decide whether the Meskwaki Settlement in Tama County, Iowa ("Settlement"), is "Indian country," as defined in 18 U.S.C. § 1151 and as applied in the Indian Major Crimes Act, 18 U.S.C. § 1153. If the Settlement is not Indian country, the court lacks jurisdiction to try Defendants LaMont William Papakee and Connie Frances Blackcloud on various charges of sex abuse. In what follows, the court holds that the Settlement is "Indian country."

## II. PROCEDURAL BACKGROUND

Defendants are charged in a two-count Superseding Indictment (docket no. 39).[1] Count 1 charges that, on or about September 6, 2006, Defendants committed the crime of Aggravated Sexual Abuse in Indian Country, in violation of 18 U.S.C. §§ 2, 1151, 1153 and 2241(a)(1). Count 2 charges Defendants with Sexual Abuse in Indian Country, on the same date, in violation of 18 U.S.C. §§ 2, 1151, 1153 and 2242(2).

On March 12, 2007, the court *sua sponte* directed the parties to brief whether the court has criminal jurisdiction over Defendants. On March 19, 2007, the government and Defendant Blackcloud jointly filed a Memorandum in Support of Federal Criminal Jurisdiction. On the same date, Defendant Papakee filed a Brief Regarding Jurisdiction. On March 21, 2007, the government filed a Supplemental Memorandum in Support of Federal Criminal Jurisdiction.

On March 22, 2007, the court held an evidentiary hearing ("Hearing"). Assistant United States Attorneys Ian K. Thornhill and Robert M. Butler represented the government. Attorney Renée V. Sneitzer represented Defendant Papakee, who was personally present. Attorney Eric K. Parrish represented Defendant Blackcloud, who was

---

[1] On December 7, 2006, Defendants were charged in a one-count Indictment (docket no. 3) with Sexual Abuse in Indian Country, in violation of 18 U.S.C. §§ 2, 1151, 1153 and 2242(2). On March 7, 2007, the Superseding Indictment was filed.

2

also personally present.

At the Hearing, the court requested additional briefing. On March 29, 2007, the government filed a Second Supplemental Memorandum in Support of Federal Criminal Jurisdiction. On March 30, 2007, Defendant Papakee filed an Addendum Brief Regarding Jurisdiction ("Defendant's Addendum"). Defendant Blackcloud did not file a brief on these two issues.

### III. PRINCIPLES OF JURISDICTION

"Federal courts are courts of limited jurisdiction, and the 'threshold requirement in every federal case is jurisdiction.'" *Bradley v. Am. Postal Workers Union, AFL-CIO*, 962 F.2d 800, 802 n.3 (8th Cir. 1992) (quoting *Sanders v. Clemco Indus.*, 823 F.2d 214, 216 (8th Cir. 1987)). The court is "obliged to inquire *sua sponte* whenever a doubt arises as to the existence of federal jurisdiction." *Mt. Healthy City Sch. Dist. Bd. of Ed. v. Doyle*, 429 U.S. 274, 278 (1977).

### A. 18 U.S.C. § 1153 (Indian Major Crimes Act)

The government premises jurisdiction upon 18 U.S.C. § 1153, the Indian Major Crimes Act. Section 1153(a) provides:

> Any Indian who commits . . . any of the following offenses, namely, murder, manslaughter, kidnapping, maiming, a felony under chapter 109A, incest, assault with intent to commit murder, assault with a dangerous weapon, assault resulting in serious bodily injury (as defined in section 1365 of this title), an assault against an individual who has not attained the age of 16 years, felony child abuse or neglect, arson, burglary, robbery, and a felony under section 661 of this title within the Indian country, shall be subject to the same law and penalties as all other persons committing any of the above offenses, within the exclusive jurisdiction of the United States.

18 U.S.C. § 1153(a). Section 1153 "subject[s Defendants] to the same body of law as any other individual, Indian or non-Indian, charged with [crimes] committed in a federal

3

enclave," *United States v. Antelope*, 430 U.S. 641, 648 (1977), provided that (1) Defendants are "Indians"; (2) the crimes charged are enumerated in § 1153; and (3) the alleged conduct occurred in "Indian country," 18 U.S.C. § 1153.

The parties agree that Defendants are "Indians" and are prepared to so stipulate at trial. Further, the parties agree that Counts 1 and 2 of the Superseding Indictment charge crimes that are enumerated in § 1153. Count 1 charges Aggravated Sexual Abuse, in violation of 18 U.S.C. § 2241, and Count 2 charges Sexual Abuse, in violation of 18 U.S.C. § 2242(2). Each crime is "a felony under chapter 109A." *See, e.g., United States v. Goodlow*, 105 F.3d 1203, 1206 n.5 (8th Cir. 1997) (holding that § 2241 is "a felony under chapter 109A"); *Escalanti v. United States*, No. 91-36163, 1992 WL 276977, *1 (Oct. 9, 1992) (stating that a crime is "a felony under chapter 109A" if it is in 18 U.S.C. §§ 2241-2245). Therefore, the only disputed issue is whether the alleged conduct occurred in "Indian country."

### B. 18 U.S.C. § 1151 (Definition of "Indian Country")

"Indian country" is defined in 18 U.S.C. § 1151. With some exceptions not relevant here, § 1151 provides:

> [T]he term "Indian country" . . . means (a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation, (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same.

18 U.S.C. § 1151. Generally speaking, then, a crime occurs in "Indian country" if it occurs on (1) an Indian reservation, (2) a dependent Indian community or (3) an Indian allotment. *Id.*

The government contends that the Settlement is "Indian country," because it is a "*de facto* reservation."  The government's theory of the case is that Defendants committed Aggravated Sexual Abuse and Sexual Abuse, or aided and abetted the same, at the Settlement address of "315 Red Earth Drive, Tama County, Iowa" ("315 Red Earth Drive").  *See generally United States v. Papakee*, No. 06-CR-162-1-LRR, 2007 WL 891717 (N.D. Iowa Mar. 21, 2007) (describing government's theory of the case).  Defendant Papakee argues that 315 Red Earth Drive is not Indian country.

## IV.  JUDGE OR JURY

Before addressing the merits of subject-matter jurisdiction, the court must decide whether the court or the jury determines whether 315 Red Earth Drive is "Indian country."  The parties agree that the government bears the burden to prove any jurisdictional facts beyond a reasonable doubt.[2]

The government submits that the court may decide, as a matter of law, the limited issue of whether the location of the alleged assault is "Indian country."  The government contends that the jury's role is simply to decide whether the assault, in fact, occurred at such location.  Defendant Papakee, on the other hand, contends that the jury must decide this issue, because the jury must find that he committed all of the elements of the crimes charged and that "the offense occurred in Indian country" is an element of both crimes.  The elements of Aggravated Sexual Abuse in Indian Country are:

> (1) the defendant did knowingly cause and attempt to cause another to engage in a sexual act, (2) by the use of force or threat of force, (3) the defendant is an Indian, and (4) the offense occurred in Indian [c]ountry.

*United States v. Youngman*, No. 06-2333, 2007 WL 957540, *4 (8th Cir. Apr. 2, 2007).  The elements of Sexual Abuse in Indian Country, as applied to the facts of this case, are:

---

[2] As will become clear in Part V of this Order, the jurisdictional facts in this case are undisputed.

Case 1:06-cr-00162-LRR   Document 88   Filed 05/02/07   Page 5 of 23

(1) the defendant did knowingly engage in a sexual act with another person, (2) who was physically incapable of declining participation in, or communicating unwillingness to engage in, that sexual act; (3) the defendant is an Indian; and (4) the offense occurred in Indian country. 18 U.S.C. § 2242(2); *accord* 9th Cir. Crim. Jury Instr. No. 8.141 (Sexual Abuse—Incapacity of Victim (18 U.S.C. § 2242(2)) (2003).

In *United States v. Stands*, 105 F.3d 1565 (8th Cir. 1997), the Eighth Circuit Court of Appeals held that "given a particular piece of land, it is for the court, not the jury, to determine whether that land is in Indian country." 105 F.3d at 1575 (citing, in part, *United States v. Deon*, 656 F.2d 354, 356-57 (8th Cir. 1981) (holding that district court properly found as a matter of law that the city of Pine Ridge, South Dakota was "Indian country") and *United States v. Cook*, 922 F.2d 1026, 1031-32 (2d Cir. 1991)). The jury must then decide whether the charged crimes *actually occurred* on such land. *Id.* at 1576.

Defendant Papakee argues that, in *Apprendi v. New Jersey*, 530 U.S. 466 (2000), the Supreme Court implicitly abrogated *Stands* when it held that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490. Defendant Papakee opines that, if he were convicted of similar conduct in state court, he would, in the "worst case, [receive] an indeterminate sentence of between ten (10) and twenty-five (25) years . . . ." Defendant's Addendum at 2 (citing Iowa Code §§ 709.3 (2005) (Sexual Abuse in the Second Degree), 709.4 (Sexual Abuse in the Third Degree) and 902.9 (Maximum Sentence for Felons)). He claims he "potentially faces life [in this case without the possibility of] parole." *Id.* Defendant thus concludes that the facts upon which this court's jurisdiction is premised "increase[] the penalty for a crime beyond the prescribed statutory maximum" and thus must be submitted to a jury. *Id.*

The court does not read *Apprendi* as broadly as Defendant Papakee. *Apprendi* dealt with the narrow issue of whether a judge may increase a criminal sentence beyond a

6

statutory maximum based on facts that are not submitted to a jury and decided beyond a reasonable doubt. *Apprendi*, 530 U.S. at 469. The court does not read *Apprendi* to require the jury to make what are, in essence, legal decisions about the status of land whenever jurisdiction is in dispute. In any event, the facts upon which jurisdiction is premised do not increase the penalty for "a crime" as contemplated in *Apprendi*. Rather, such facts potentially increase the penalty for certain *conduct*, insofar as they determine what crimes—*federal or state*—may be prosecuted. *Cf. Antelope*, 430 U.S. at 649 (upholding analogous equal protection challenge to the Indian Major Crimes Act, because "[u]nder our federal system, the National Government does not violate equal protection when its own body of law is evenhanded, regardless of the laws of the States with respect to the same subject matter" (footnotes and citation omitted)).

Accordingly, the court finds that the court, not the jury, must decide whether the evidence shows beyond a reasonable doubt that 315 Red Earth Drive is "Indian country."

## V. FACTUAL FINDINGS

At the Hearing, the government presented evidence to show that the Settlement, which includes 315 Red Earth Drive, is "Indian country." Based upon such evidence[3] and recognizing the Eighth Circuit Court of Appeals' admonition that "'[f]ederal Indian law is a subject that cannot be understood if the historical dimension of existing law is ignored,'" *Sac & Fox Tribe of the Miss. in Iowa v. Licklider*, 576 F.2d 145, 147 (8th Cir. 1978) (quoting *United States v. Erickson*, 478 F.2d 684, 686 (8th Cir. 1973)), the court makes the following factual findings beyond a reasonable doubt:

---

[3] At the Hearing, the court admitted Exhibits 4, 5, 8, 9, 10 and 11. The government also offered Exhibits 1, 2, 3, 6 and 7, and Defendant Papakee offered two exhibits, Exhibits A and B. Because the court shall hold that 315 Red Earth Drive is "Indian country" without reliance on Exhibits 1, 2, 3, 6 or 7, the court need not decide whether such exhibits are admissible. The court overrules the government's relevancy objections to Exhibits A and B.

7

### A. History of the Settlement to 1978

In *Licklider*, the Eighth Circuit Court of Appeals summarized the history of the Settlement as follows:

> [Before] 1700[,] the Sac and Fox Tribes were distinct separate tribes residing in what is now central Wisconsin. As a result of war between the Fox and the French in the early 18th Century, the Fox were reduced in number and formed a loose confederation with the Sac. By 1800[,] the Sac and Fox had established villages along the Mississippi River in what is now Iowa and Illinois. Hunting, fishing and trapping took them as far west as central Iowa.
>
> The Sac were first recognized by the United States in the Treaty of Jan[uary] 9, 1789, when the United States received the Sac into its friendship and protection. The Sac and Fox were jointly recognized in the Treaty of Nov[ember] 3, 1804, in which much of what later became Illinois, Wisconsin and Missouri was ceded to the United States in exchange for certain payments and guarantees. In a series of treaties from 1804 through 1842, the Sac and Fox ceded other portions of their lands to the United States in exchange for payments, annuities and services.
>
> In 1842[,] the Sac and Fox Tribe ceded all its land west of the Mississippi River (which includes the [Settlement]) to the United States and agreed to move to a reservation located in what is now the state of Kansas. The move was to be accomplished within three years after the treaty date. Many members of the Fox Tribe and some members of the Sac Tribe who agreed to move to the reservation in Kansas pursuant to the 1842 treaty became dissatisfied with the Kansas reservation and returned to Iowa. In 1856[,] the Iowa legislature consented to the continued residence of the Sac and Fox then in Iowa and urged the United States to pay these Indians [("the Tribe")] their proportionate annuities under the various treaties with the Sac and Fox Tribe. The Tribe purchased a small tract of land in 1857 and title was taken by the governor of Iowa in trust for the Indians.

8

In 1865[,] the federal government sent an Indian agent to Iowa to supervise the Tribe. In 1867[,] Congress approved the payment of the 1842 treaty annuities to the Tribe in Iowa "so long as they are peaceful and have the assent of the government of Iowa to reside in that State." Additionally[,] in 1867[,] another treaty was negotiated with the Sac and Fox Tribe which required each absent member to move onto the reservation in the Indian Territory or lose his right to funds arising under all treaties with the Sac and Fox. The Tribe in Iowa was specifically exempted from this requirement.

Between 1856 and 1896, the Tribe acquired more land in Tama County with funds generated through the sale of pelts and horses, charitable contributions, and treaty annuities. By 1896, the governor of Iowa held the title to 2,720 acres of land in trust for the benefit of the Tribe. The Indian agent held the title to an additional 280 acres as trustee for the benefit of the Tribe.

In 1896[,] Iowa tendered exclusive jurisdiction over the Tribe and their lands held in trust for them to the United States, with the following exception:

Nothing contained in this act shall be so construed as to prevent on any of the lands referred to in this act the service of any judicial process issued by or returnable to any court of this state or judge thereof, or to prevent such courts from exercising jurisdiction of crimes against the laws of Iowa committed thereon either by said Indians or others, or of such crimes committed by said Indians in any part of this state.

The United States accepted this tender . . . .

576 F.2d at 147-49 (citations and footnotes omitted).[4]  As of 1978, the Settlement

_____

[4] The court takes judicial notice of facts of *Licklider*. *See Stutzka v. McCarville*, 420 F.3d 757, 760 n.2 (8th Cir. 2005) (stating that courts may take judicial notice of judicial opinions and public records).  For other judicial opinions that offer consistent
(continued…)

9

consisted of a 3000 acre tract in Tama County, Iowa, which was held in trust by the United States for the use and benefit of the Tribe. *Licklider,* 576 F.2d at 147.

## B. History of the Settlement after 1978[5]

Since 1978, the Tribe has expanded the geographic area of the Settlement. Periodically, the Tribe has purchased various tracts of land. Some of these tracts of land are adjacent to the original Settlement boundaries, but others are not. After purchasing a tract of land, the Tribe often—but not always—conveys such tract to the United States in trust for the Tribe. Although the Tribe (as opposed to the United States) retains legal title to some land, the legal status of such land is not at issue here.

In the 1990s, the Tribe purchased a tract of land ("Tract")[6] from two local

---

[4](…continued)
accounts of the history of the Settlement, *see Sac & Fox Indians of the Miss. in Iowa v. Sac & Fox Indians of the Miss. in Okla.*, 220 U.S. 481 (1910); *Webster v. Reid*, 52 U.S. 437 (1850); *In re Lelah-puc-ka-chee*, 98 F. 429 (N.D. Iowa 1899); *State v. Lasley*, 705 N.W.2d 481 (Iowa 2005); *State v. Bear*, 452 N.W.2d 430 (Iowa 1990).

[5] The following factual findings are primarily based upon the various exhibits received into evidence, as well as the testimony of Ms. Laura Kopsa, the Tama County Auditor; Mr. Larry Lasley, the Tribe's Executive Director and its former Housing Director; and Mr. Kevin Bearquiver, Deputy Regional Director for Trust Services for the Bureau of Indian Affairs's Midwest Regional Office. All three individuals testified at the Hearing, and their testimony was unrebutted. The court finds that the testimony of Ms. Kopsa and Messrs. Lasley and Bearquiver is fully credible.

[6] The legal description of the Tract is:

The West Half of the West Half (W½ W½) of Section Eighteen (18); the Northwest Quarter of the Northwest Quarter (NW¼ NW¼), EXCEPT burying ground one (1) rod wide and two (2) rods long North and South; AND the North Half of the Southwest Quarter of the Northwest Quarter (N½ SW¼ NW¼) of Section Nineteen (19), all in Township Eighty-three (83) North, Range 15, West of the 5th P.M., in

(continued…)

Case 1:06-cr-00162-LRR   Document 88   Filed 05/02/07   Page 10 of 23

landowners. Specifically, on March 2, 1994, Lyle A. Holtz and Alice K. Holtz, husband and wife, signed over the Tract to the Tribe by warranty deed, which was recorded on the same date. Gov't Ex. 4. The Tribe purchased the Tract to build a new school and to meet the Tribe's growing housing needs.

The Tract is north of, and adjacent to, the original boundaries of the Settlement. In 1995, the Tribe began the process of incorporating the Tract into the Settlement by conveying the Tract to the United States in trust for the Tribe. On June 27, 1995, the Tribe signed over the Tract by warranty deed "to The United States of America in Trust for the Sac and Fox Tribe of the Mississippi in Iowa." Gov't Ex. 5 at 1. The latter warranty deed was not recorded, however, until August 31, 1998. By its express terms, the "conveyance [was] made pursuant to the Indian [R]eorganization Act of 1934 (48 Stat. 984)." *Id.*

Since at least August of 1998,[7] then, the United States has continuously held title

--------

[6] (…continued)
Tama County, Iowa;

AND

The Northeast Quarter (NE¼); the North Half of the Southeast Quarter (N½ SE¼); the East Half of the Southeast Quarter of the Southeast Quarter (E½ SE¼ SE¼); AND all that part of the West Half of the Southeast Quarter of the Southeast Quarter (W½ SE¼ SE¼), lying North of the public road, EXCEPT the West eight (8) rods thereof, all in Section Thirteen (13), Township Eighty-three (83) North, Range Sixteen (16), West of the 5th P.M., in Tama County, Iowa.

Gov't Ex. 4 at 2; Gov't Ex. 5 at 1.

[7] In Iowa, "[a] conveyance by deed does not take place until the deed is delivered." *Martin v. Martin*, 720 N.W.2d 732, 735 (Iowa 2006). However, "[t]here is a longstanding presumption that delivery occurs on the date the deed is signed." *Id.* at 736; *accord*
(continued…)

Case 1:06-cr-00162-LRR   Document 88   Filed 05/02/07   Page 11 of 23

to the entire Tract in trust for the Tribe.  Once the Tract entered into this "trust status," the Tribe stopped paying state and local taxes on the Tract.  The Tribe's government became responsible for the day-to-day civic needs (*e.g.*, snow removal) of those persons living on the Tract.  The Tribe needs the approval of the United States, however, to enter into leases or contracts on the Tract.  In the words of Mr. Kevin Bearquiver, Deputy Regional Director for Trust Services for the Bureau of Indian Affairs's Midwest Regional Office, the United States acts as "the superintendent of the land for the Tribe."

The Tribe eventually constructed a house on 315 Red Earth Drive.  On February 2, 2002, the Tribe assigned the house to Defendant Papakee pursuant to tribal law.  Gov't Ex. 10; *see also* Def's Exs. A and B.

## VI.  ANALYSIS

As indicated, land is "Indian country" if it is part of (1) an Indian reservation, (2) a dependent Indian community or (3) an Indian allotment.  18 U.S.C. § 1151.  The Eighth Circuit Court of Appeals has not explicitly addressed whether the Settlement is "Indian country" for purposes of 18 U.S.C. §§ 1151 and 1153.[8]  The government and Defendant Blackcloud submit that the Settlement is "Indian country," because it is an "informal" or "*de facto* reservation."  Whether land is "Indian country" is a question of federal law.

---

[7](…continued)
*Klosterboer v. Engelkes*, 125 N.W.2d 115, 119 (Iowa 1963) ("In the absence of evidence to the contrary[,] a recorded deed is presumed to have been delivered on the date of its execution and acknowledgment.").  Mr. Bearquiver testified that the United States formally accepted the Tract into "trust status" on August 26, 1998, five days before the warranty deed was recorded.

[8] Prosecutions in this court under the Indian Major Crimes Act for crimes allegedly committed on the Settlement are very rare.  *But see United States v. Butler*, 56 F.3d 941 (8th Cir. 1995) (affirming convictions for violations of the Indian Major Crimes Act without discussing jurisdiction, where the activity that provided the factual basis for the defendant's convictions occurred on the Settlement).

12

*Seymour v. Superintendent of Wash. State Penitentiary*, 368 U.S. 351, 353 (1962).

## A. The Settlement

### 1. Informal reservation status

The court holds that the Settlement is a "reservation" for purposes of § 1151. The court recognizes that there is no indication that a specific treaty, statute or executive order created a "reservation" in Tama County, Iowa for the Tribe. *Licklider*, 576 F.2d at 150. "It is well established that the actions of the federal government in its treatment of Indian land can create a *de facto* reservation, even though the reservation was not created by a specific treaty, statute or executive order." *United States v. Azure*, 801 F.2d 336, 338 (8th Cir. 1986) (citations omitted).

Construing § 1151, the Supreme Court has observed that "Congress has defined Indian country broadly to include formal and informal reservations . . . ." *Okla. Tax Comm'n v. Sac & Fox Nation*, 508 U.S. 114, 123 (1993). In other words, "the test for determining whether land is Indian country does not turn upon whether that land is denominated . . . "reservation" [but] . . . . whether the area has been validly set apart for the use of the Indians as such, under the superintendence of the Government." *Okla. Tax. Comm'n v. Citizen Band Potawatomi Indian Tribe of Okla.*, 498 U.S. 505, 511 (1991) (citations and internal quotation marks omitted); *South Dakota v. U.S. Dep't of Interior*, 475 F.3d 993, 999 (8th Cir. 2007) ("To determine whether land is categorized as . . . 'reservation,' the Court asks 'whether the area has been validly set apart for the use of the Indians as such, under the superintendence of the government.'" (Citation omitted.).[9]

---

[9] The Tenth Circuit Court of Appeals observed that, in *Alaska v. Native Village of Venetie*, 522 U.S. 520 (1998), the Supreme Court collapsed any distinction between informal "reservations" and "dependent Indian communities." *United States v. Roberts*, 185 F.3d 1125, 1133 (10th Cir. 1999). The Tenth Circuit held, however, that *de facto* or informal reservations "continue to exist under 18 U.S.C. § 1151 and Supreme Court jurisprudence." *Roberts*, 185 F.3d at 1133. The court predicts that the Eighth Circuit
(continued…)

13

*2.* **Licklider**

In *Licklider*, the Eighth Circuit Court of Appeals held, albeit in a different context, that the Settlement is a "reservation." The Eighth Circuit Court of Appeals observed:

> It is clear from the treaty language that at least by 1845, when the Sac and Fox were required to be moved from the ceded land, no reservation existed in Iowa.
>
> It is equally clear, however, that as early as 1865 the United States began to treat the Tama tract occupied by the Tribe as a de facto reservation. For example, in 1865 the federal government sent a special Indian agent to Tama and established a special agency for the Tribe, which continues to the present date. In the Act of Mar[ch] 2, 1867, the United States approved the payment of the 1842 treaty annuities to the Tribe in Iowa. Furthermore, in the Treaty of Oct[ober] 4, 1868, the tribal members living in Iowa were explicitly excepted from the requirement of rejoining the full Sac and Fox Tribe. From at least 1874, the Bureau of Indian Affairs expended money for the education of members of the Tribe, including the construction of a boarding school in Toledo, Iowa. These early actions by the federal government demonstrate that the United States recognized the Tribe in Iowa and dealt with them comparably to the Sac and Fox located on the Kansas reservation.

---

[9](…continued)
Court of Appeals would agree, because it very recently reaffirmed the reality of the informal reservation. *See South Dakota*, 475 F.3d at 999. That said, if the Supreme Court or Eighth Circuit Court of Appeals were to jettison the concept of the informal reservation in order to restore a distinction between "reservations" and "dependent Indian communities," the Settlement is still "Indian country," because it clearly meets *Venetie*'s test for a "dependent Indian community." *See Roberts*, 185 F.3d at 1133 (observing that "[w]e need not further expound on the Supreme Court's cases in this area because, no matter which categorical label we choose to affix, the property in this case, owned by the United States in trust for the Choctaw Nation, is Indian [c]ountry, particularly in light of the district court's findings the . . . property was validly set-aside for the tribe under the superintendence of the federal government.").

14

Any doubt was eliminated by the federal government in 1896, when the United States accepted and assumed "jurisdiction over the Sac and Fox Indians of Tama County" and their land.

. . . .

Since 1897, the Bureau of Indian Affairs has expended funds for the Tribe in the areas of social services, land management, employment assistance, health services, including water and sanitation, police services, and education.

Finally, in . . . 1948, Congress specifically referred to the [Settlement] tract when it spoke of "offenses committed by or against Indians on the Sac and Fox Indian Reservation . . . ."

The state argues that the Tama tract cannot be a reservation since no specific treaty, statute or executive order has created a reservation. However, as stated years ago by the Supreme Court:

> [I]n order to create a reservation, it is not necessary that there should be a formal cession or a formal act setting apart a particular tract. It is enough that from what has been done there results a certain defined tract appropriated to certain purposes.

Thus, we are persuaded that the land located in Tama County and occupied by the Tribe constitutes an Indian reservation.

*Licklider*, 576 F.2d at 149-50 (citations omitted).  Similarly, over 100 years ago, this court reasoned:

> [I]t is contended the land occupied by [the Tribe] cannot be deemed to be an Indian reservation, because the title thereto is vested . . . in trust for the [Tribe], and was purchased by the [Tribe] after the admission of Iowa into the Union.
> . . . .
> [I]t must be held that the Indians residing in Tama county are tribal Indians residing on lands purchased for their benefit with the consent of the state, which lands constitute a reservation

15

> under the control of the United States in all matters pertaining to the domestic relations of the Indians, and, furthermore, that their status as tribal Indians is not based upon the act of the general assembly of Iowa just cited, but grows out of the fact that they are a part of the confederated tribes of Sacs and Foxes, between whom and the national government the relation of wards or dependents had been recognized and existed long before the state of Iowa was organized, and which condition of dependency has never been changed by any act of the national government.

*Peters v. Malin*, 111 F. 244, 250-51 (C.C.N.D. Iowa 1901); *see In re Lelah-puc-ka-chee*, 98 F. 429, 432 (N.D. Iowa 1899) ("[I]t sufficiently appears that the reservation in Tama county and the Indians living thereon are now committed to the care and control of the United States government . . . ."). Because the Settlement is land set aside for the use of the Indians as such, under the superintendence of the government, it is "Indian country."

### 3. The *Youngbear* cases

Another Eighth Circuit Court of Appeals case, *Youngbear v. Brewer*, 549 F.2d 74 (8th Cir. 1977) ("*Youngbear III*"), further supports the conclusion that the Settlement is "Indian country." A full understanding the importance of this decision requires some discussion of two prior cases: *State v. Youngbear*, 229 N.W.2d 728 (Iowa 1975) ("*Youngbear I*") and *Youngbear v. Brewer*, 415 F. Supp. 807 (N.D. Iowa 1976) (McManus, C.J.) ("*Youngbear II*").

#### a. Youngbear I

In 1974, a jury convicted Ellsworth Youngbear of murder for shooting Vincent Lasley on the Settlement at the home of Clyde Papakee. *Youngbear*, 229 N.W.2d at 730-31. On direct appeal to the Iowa Supreme Court, Youngbear argued that the Settlement was "Indian country" as defined in § 1151. He further argued that State of Iowa lacked the authority to prosecute him, because, he alleged, § 1153 vested exclusive jurisdiction over crimes occurring in "Indian country" to the United States, if those crimes were

16

specified in such statute. *Youngbear*, 229 N.W.2d at 732.

The Iowa Supreme Court held that the Settlement is "Indian country." *Id.* The Iowa Supreme Court reasoned:

> 'Indian [c]ountry' within the meaning of the term used in [§ 1153] is defined in [§ 1151]. The application of the 'Indian [c]ountry' definition does not depend upon the manner in which the land in question was acquired, but rather on whether such land has been, as was the [Settlement] in this case, set apart for the use and occupancy of Indians. *See United States v. McGowan*, 302 U.S. 535 [(1938)]. We conclude the [Settlement] meets the statutory definition of 'Indian [c]ountry' as construed by the courts.

*Id.* The Iowa Supreme Court affirmed Youngbear's conviction, however, because it further held that the Act of June 30, 1948, ch. 759, 62 Stat. 1161, granted federal courts concurrent jurisdiction over the crimes enumerated in § 1153. *Id.* at 733.

### b.    Youngbear II

Youngbear then sought a writ of habeas corpus in this court, on the ground that the state courts did not have jurisdiction to try him for murder. This court granted the writ. As a threshold matter, the court agreed that the Settlement was "Indian country." The court reasoned:

> [The S]ettlement is 'Indian [c]ountry' within [§ 1151]. The determination of whether lands are considered 'Indian [c]ountry' does not turn on the label used in designating them, *United States v. McGowan*, 302 U.S. 535 (1938), nor on the manner in which the lands in question were acquired. Rather the test is whether such lands have been set apart for the use, occupancy and protection of dependent Indian peoples. *See McGowan*, [302 U.S. at 538]. This court concurs with the Iowa Supreme Court [in *Youngbear I*] that under the principles espoused above, the [Settlement] meets the statutory definition of 'Indian [c]ountry.'

*Youngbear II*, 415 F. Supp. at 809 (citations and footnote omitted). This court held,

Case 1:06-cr-00162-LRR    Document 88    Filed 05/02/07    Page 17 of 23

however, that jurisdiction over the offenses enumerated in § 1153 was vested exclusively in the federal courts and thus the writ must be granted. *Id.* at 810.

### c. *Youngbear III*

The State of Iowa appealed this court's decision to grant the writ of habeas corpus to Youngbear. The Eighth Circuit Court of Appeals held that jurisdiction over crimes committed in "Indian country" is exclusive and affirmed "on the basis of" this court's opinion. *Youngbear III*, 549 F.2d at 76. However, the Court did not explicitly address the district court's holding that the Settlement was "Indian country."

### d. The importance of the **Youngbear** cases

*Youngbear I* and *II* support the court's conclusion that the Settlement is "Indian country," insofar as both courts reached the same conclusion as the court does today. The court recognizes, however, that neither decision is binding.

*Youngbear III* is binding on this court, insofar as it is not inconsistent with Supreme Court precedent.[10] Even though the Eighth Circuit Court of Appeals did not explicitly discuss whether the Settlement is as "Indian country," it implicitly affirmed this court's decision that the Settlement is "Indian country" when it affirmed "on the basis of" this court's opinion. Indeed, the Eighth Circuit Court of Appeals' decision in *Youngbear III* requires a finding that the Settlement is "Indian country," because without such a finding, the decision would not make sense. In *Youngbear III*, the Eighth Circuit Court of Appeals

---

[10] In *Negonsott v. Samuels*, 507 U.S. 99 (1993), the Supreme Court held that, despite the seeming exclusivity of 18 U.S.C. § 1153, 18 U.S.C. § 3243 unambiguously confers jurisdiction over the crimes that are enumerated in 18 U.S.C.§ 1153 to the State of Kansas. 507 U.S. at 110. Because there are no material differences between Kansas and Iowa in this respect, *see Negonsott*, 507 U.S. at 101 n.1 (citing Act of June 30, 1948, ch. 759, 62 Stat. 1161), *Negonsott* abrogated *Youngbear II* and *III* and vindicated *Youngbear I*. The Supreme Court did not disturb the unanimous agreement of both the federal and the state courts in the *Youngbear* decisions that the Settlement is Indian country.

Case 1:06-cr-00162-LRR   Document 88   Filed 05/02/07   Page 18 of 23

held that the state court did not have jurisdiction, because the federal court had exclusive jurisdiction over the crimes enumerated in the Indian Major Crimes Act. As indicated, the Indian Major Crimes Act only applies to offenses committed in "Indian country." 18 U.S.C. § 1153.

### 4. Conclusion

For all of the foregoing reasons, the court holds that the Settlement is "Indian country," as defined in § 1151 and as applied in § 1153.

### B. 315 Red Earth Drive

Defendant Papakee contends that, even if the Settlement is "Indian country," it does not necessarily follow that 315 Red Earth Drive is "Indian country." Defendant points out that 315 Red Earth Drive is on the Tract and not within the original boundaries of the Settlement.

All of the evidence at the Hearing indicated that the Tract is part of the Settlement. Therefore, 315 Red Earth Drive is "Indian country," just as the rest of the Settlement is "Indian country." The Tract and the original Settlement are all part of the same *de facto* "reservation."

Even if the Tract were somehow distinct from the original Settlement, 315 Red Earth Drive is still "Indian country." The uncontroverted evidence is that the Tract is Indian "trust land," that is, it is land acquired by the United States in trust for the Tribe pursuant to the Indian Reorganization Act of 1934, 48 Stat. 984 (codified at 25 U.S.C. § 465),[11] and 25 C.F.R. § 151.1 (2006), *et seq. See Stands*, 105 F.3d at 1572 (defining

---

[11] Section 465 provides:

> The Secretary of the Interior is hereby authorized, in his discretion, to acquire, through purchase, relinquishment, gift, exchange, or assignment, any interest in lands, . . . within or without existing reservations, including trust or otherwise

(continued...)

19

"[t]ribal trust land" as "land owned by the United States in trust for an Indian tribe"); 25 C.F.R. § 151.2(d) (defining "trust land" as "land the title to which is held in trust by the United States for an individual Indian or a tribe").  In *United States v. Azure*, 801 F.2d 336 (8th Cir. 1986), the Eighth Circuit Court of Appeals held that Indian trust land, even if not within the boundaries of a "reservation," may nonetheless "be classified as a *de facto* reservation, at least for purposes of federal criminal jurisdiction."  801 F.2d at 339[12]; *see also United States v. John*, 437 U.S. 634, 649 (1978) (opining that there was "no apparent reason" that trust lands "did not become a 'reservation,' at least for purposes

---

[11] (...continued)
> restricted allotments . . . for the purpose of providing land for Indians.
>                    . . .
> Title to any lands or rights acquired pursuant to sections . . . 465 [and others] shall be taken in the name of the United States in trust for the Indian tribe or individual Indian for which the land is acquired, and such lands or rights shall be exempt from State and local taxation.

25 U.S.C. § 465.

[12] There is some tension in the Eighth Circuit Court of Appeals' precedents on this issue, insofar as in *Stands* the Eighth Circuit Court of Appeals stated that "[f]or jurisdictional purposes, tribal trust land beyond the boundaries of a reservation is ordinarily not Indian country." 105 F.3d at 1575 n.3. In other words, "the Eighth Circuit has not always followed *Azure*, although it recognizes the precedent." *Robert*s, 185 F.3d at 1131 n.3 (10th Cir. 1999) (discussing *Azure* and *Stands*)). The court agrees with Judge Schreier that the quoted language from *Stands* is "dicta which does not overcome the wealth of legal authority establishing that trust land qualifies as 'Indian country.'" *State of S.D. v. U.S. Dep't of Interior*, 401 F. Supp. 2d 1000, 1010 (D.S.D. 2005), *aff'd*, 475 F.3d 993 (8th Cir. 2007); *see, e.g., Roberts*, 185 F.3d at 1131 (stating categorically that "lands owned by the federal government in trust for Indian tribes are Indian [c]ountry pursuant to 18 U.S.C. § 1151"); *Langley v. Ryder*, 778 F.2d 1092, 1095 (5th Cir. 1985) ("[W]hether lands are merely held in trust for the Indians or whether the lands have been officially proclaimed a reservation, the lands are clearly Indian country.").

of federal criminal jurisdiction" (citing *United States v. Celestine*, 215 U.S. 278, 285 (1909)).

Even if 315 Red Earth Drive is not a "reservation," it is still "Indian country." As in *Azure*, such trust land can be considered a "dependent Indian community." Land is part of a "dependent Indian community" if it is (1) validly set aside for the use of Indians as such and (2) under the superintendence of the government. *Alaska v. Native Vill. of Venetie Tribal Gov't*, 522 U.S. 526-32 (1998).[13] All of the evidence presented at the Hearing fully supports both elements: 315 Red Earth Drive, as trust land, is validly set aside for the use of Indians as such and is under the superintendence of the government. *See, e.g., McGowan*, 302 U.S. at 538-39 (holding trust land met set-aside and superintendency requirements); *Roberts*, 185 F.3d at 1132 (noting that "trust status can demonstrate both federal set aside and superintendence").

Accordingly, the court holds that 315 Red Earth Drive is "Indian country." 18 U.S.C. § 1151. At trial, the court shall instruct the jury as follows:

> The government must prove the alleged assault took place in Indian country. I instruct you now that the Settlement, including 315 Red Earth Drive, Tama County, Iowa, is in Indian country. Therefore, if you find beyond a reasonable doubt that the actions alleged occurred at 315 Red Earth Drive, Tama County, Iowa, this element of each of the charged offenses has been met.

*Cf. United States v. Hernandez-Fundora*, 58 F.3d 802, 809 (2d Cir. 1995) (following *United States v. Jones*, 480 F.2d 1135, 1138-39 (2d Cir. 1973) (cited with approval in *Deon,* 656 F.2d at 357)).

---

[13] *Venetie* implicitly abrogated *Azure*'s four-factor test for determining whether a particular area is a "dependent Indian community." *See Venetie*, 522 U.S. at 531 n.7 (abrogating a six-factor test that, like *Azure*'s four-factor test, developed in part from *United States v. South Dakota*, 665 F.2d 837, 839 (8th Cir. 1981)).

21

## VII.  DISPOSITION

The Settlement, including 315 Red Earth Drive, is "Indian country" as defined in 18 U.S.C. § 1151.  Accordingly, the court finds that it has jurisdiction over the crimes alleged in the Superseding Indictment pursuant to the Indian Major Crimes Act, 18 U.S.C. § 1153.

**IT IS THEREFORE ORDERED:**

(1)     At trial, the court shall instruct the jury as set forth in Part VI.B of this Order; and

(2)     The time between the filing of the court's March 12, 2007 Order (docket no. 44) and the date of the instant Order, up to thirty days, is hereby excluded from calculation under the Speedy Trial Act.  *See* 18 U.S.C. § 3161(h)(1)(J) (excluding "delay reasonably attributable to any period, not to exceed thirty days, during which any proceeding concerning the defendant is actually under advisement by the court"); further, the time between the filing of Defendant Papakee's March 19, 2007 Brief Regarding Jurisdiction (docket no. 59), which the court construes as a pre-trial motion to dismiss for want of jurisdiction pursuant to Federal Rule of Criminal Procedure 12(b)(3)(B), and the instant Order, is also excluded from calculation under the Speedy Trial Act.  *See* 18 U.S.C. § 3161(h)(1)(F) (excluding delay resulting from the filing of any pretrial motion through the conclusion of the hearing thereon and/or "other prompt disposition of, such motion").

Case 1:06-cr-00162-LRR   Document 88   Filed 05/02/07   Page 22 of 23

**IT IS SO ORDERED.**

**DATED** this 2d day of May, 2007.

LINDA R. READE
CHIEF JUDGE, U.S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA

23