## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
## CEDAR RAPIDS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>LAMONT WILLIAM PAPAKEE,<br><br>Defendant. | No. 06-CR-162-LRR<br><br><br>**SENTENCING<br>MEMORANDUM** |

---

## I. INTRODUCTION

The matter before the court is the sentencing of Defendant Lamont William Papakee.

## II. RELEVANT PROCEDURAL BACKGROUND

On March 7, 2007, Defendant was charged in a two-count Superseding Indictment with his co-defendant, Connie Frances Blackcloud ("Blackcloud").[1] Count 1 charged that, on or about September 6, 2006, defendants committed the crime of Aggravated Sexual Abuse in Indian Country, in violation of 18 U.S.C. §§ 2, 1151, 1153 and 2241(a)(1).[2]

---

[1] On December 7, 2006, Defendant and Blackcloud were charged in a one-count Indictment with Sexual Abuse in Indian Country, in violation of 18 U.S.C. §§ 2, 1151, 1153 and 2242(2).

[2] **§ 2241. Aggravated sexual abuse**

**(a) By force or threat.**—Whoever . . . knowingly causes another person to engage in a sexual act—

**(1)** by using force against that other person;

\* \* \* \*

(continued...)

Count 2 charged defendants with Sexual Abuse in Indian Country, on the same date, in violation of 18 U.S.C. §§ 2, 1151, 1153 and 2242(2).[3]

On June 25, 26, 27 and 28, 2007, defendants appeared before the court for a jury trial on both counts of the Superseding Indictment. On June 28, 2007, the jury returned verdicts of not guilty as to both defendants on Count 1 and verdicts of guilty as to both defendants as to Count 2. The undersigned accepted the jury's verdicts.

---

[2](…continued)

> or attempts to do so, shall be fined under this title, imprisoned for any term of years or life, or both.

18 U.S.C. § 2241(a)(1) (emphasis in original). Section 2241 was amended in 2007, *see* Pub. L. 110-161, 121 Stat. 2082 (Dec. 26, 2007), however, such amendment is not relevant here.

[3]

**§ 2242. Sexual abuse**

> Whoever . . . knowingly—
>
> * * * *
>
> **(2)** engages in a sexual act with another person if that other person is—
>
> > **(A)** incapable of appraising the nature of the conduct; or
> >
> > **(B)** physically incapable of declining participation in, or communicating unwillingness to engage in, that sexual act;
>
> or attempts to do so, shall be fined under this title and imprisoned for any term of years or for life.

18 U.S.C. § 2242(2) (2006) (emphasis in original). Section 2242 was amended in 2007, *see* Pub. L. 110-161, 121 Stat. 2082 (Dec. 26, 2007), however, such amendment is not relevant here.

On February 27, 2008, the United States Probation Office ("USPO") filed Defendant's Presentence Investigation Report ("PSIR"). On April 9, 2008, the government and Defendant filed their respective sentencing memoranda.

On April 23, 2008, the court held a sentencing hearing ("Hearing"). Assistant United States Attorney Robert L. Teig represented the government. Attorney Jonathan B. Hammond represented Defendant, who was personally present.

At the Hearing, the court sentenced Defendant to 360 months of imprisonment. The instant Sentencing Memorandum is designed to explain how the court arrived at Defendant's sentence. It is not comprehensive and should be read in conjunction with the record the court made at the Hearing.

### III. SENTENCING FRAMEWORK

The Sentencing Guidelines are no longer mandatory. *See Kimbrough v. United States*, 128 S. Ct. 558, 574 (2007) (discussing *United States v. Booker*, 543 U.S. 220, 245 (2005)). They are advisory. *Id.*

The Eighth Circuit Court of Appeals states that a "district court should begin [a sentencing proceeding] with a correct calculation of the advisory Sentencing Guidelines range." *United States v. Braggs*, 511 F.3d 808, 812 (8th Cir. 2008). The advisory Sentencing Guidelines range "is arrived at after determining the appropriate Guidelines range and evaluating whether any traditional Guidelines departures are warranted." *United States v. Washington*, 515 F.3d 861, 865 (8th Cir. 2008). "Then, after giving both parties a chance to argue for the sentence they deem appropriate, the court should consider all of the factors listed in 18 U.S.C. § 3553(a) to determine whether they support the sentence requested by either party." *Braggs*, 511 F.3d at 812. "The district court may not assume that the Guidelines range is reasonable, but instead 'must make an individualized assessment based on the facts presented.'" *Id.* (quoting *United States v. Gall*, 128 S. Ct. 586, 597 (2007)). "If the court determines that a sentence outside of the Guidelines is

called for, it 'must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance.'" *Id.* "The sentence chosen should be adequately explained so as 'to allow for meaningful appellate review and to promote the perception of fair sentencing.'" *Id.*

At the Hearing, the court based its factual findings upon the trial evidence and the uncontested provisions of the PSIR. The court's factual findings were not necessarily consistent with those of the jury, which inexplicably acquitted defendants of Count 1. In the Eighth Circuit, it is settled that "[a]cquitted conduct may be used for sentencing purposes if proved by a preponderance of the evidence." *United States v. No Neck*, 472 F.3d 1048, 1055 (8th Cir. 2007) (citing *United States v. Whatley*, 133 F.3d 601, 606 (8th Cir. 1998)). Other Circuit Courts of Appeals agree. *See, e.g., United States v. Jimenez*, 513 F.3d 62, 88 (3d Cir. 2008) ("The counts of conviction determined [the defendant's] sentencing exposure, and the district court was free to consider relevant conduct, including conduct resulting in acquittal, that was proved by a preponderance of the evidence in determining [the defendant's] sentence within the original statutory sentencing range."); *United States v. Four Pillars Enter. Co., Ltd.*, 253 F.App'x 502, 508 (6th Cir. 2007) (same); *United States v. Tello-Nicio*, 242 F.App'x 892, 893 (4th Cir. 2007) (same); *United States v. Horne*, 474 F.3d 1004, 1006 (7th Cir. 2007) (same); *United States v. Mercado*, 474 F.3d 654, 657-58 (9th Cir. 2007) (same).

Defendant appeared to concede that, under governing precedent, the court could base his sentence in part upon acquitted conduct. However, Defendant urged the court to hold the government to a clear-and-convincing burden of proof. Defendant contended that, because the consideration of judge-found facts in his case could significantly increase his advisory Sentencing Guidelines range, due process demanded a higher burden of proof. *See, e.g., United States v. Kikumura*, 918 F.2d 1084, 1089 (3d Cir. 1990) (citing *McMillan v. Pennsylvania*, 477 U.S. 79, 88 (1986) (stating, in dictum, that a sentencing

enhancement should not become "the tail which wags the dog of the substantive offense")).

Due process does not demand that the court hold the government to a clear-and-convincing burden of proof at sentencing in this case. The Eighth Circuit Court of Appeals recently addressed *Kikumura* in *United States v. Bradford*, 499 F.3d 910, 920 (8th Cir. 2007). In dicta, the Eighth Circuit Court of Appeals indicated that due process might require a higher burden of proof in cases where "'the magnitude of a proposed [increase based on judge-found facts] dwarfs the guideline range applicable to the substantive offense[] of conviction.'" *Bradford*, 499 F.3d at 919 (quoting *Kikumura*, 918 F.2d at 1089). After *Bradford* was decided, however, the Third Circuit Court of Appeals expressly disavowed *Kikumura*. *See United States v. Fisher*, 502 F.3d 293, 305 (3d. Cir. 2007), *cert. denied*, 76 U.S.L.W. 3498 (U.S. Mar. 17, 2008) (explaining why *United States v. Booker*, 543 U.S. 220 (2005), completely undermined *Kikumura*'s jurisprudential foundation).[4] The Third Circuit Court of Appeals succinctly stated:

> [A]lthough concerns about the "tail wagging the dog" were valid under a mandatory guideline system—like the Pennsylvania system addressed in *McMillan* and the federal Guidelines when *Kikumura* was decided—these concerns were put to rest when *Booker* rendered the Guidelines advisory. For this reason, we hold that *Kikumura* is no longer valid as long as the Guidelines are advisory.

*Id.*

Even if the court were to assume that due process could somehow require a higher burden of proof in some cases, any increase attributable to judge-found facts is not an extreme enough increase to warrant such a higher burden in this case. At most, Defendant

---

[4] The Eighth Circuit Court of Appeals subsequently affirmed a district court case that recognized that *Kikumura* was no longer good law. *See United States v. Grover*, 511 F.3d 779 (8th Cir.), *aff'g* 486 F. Supp. 2d 868, 872 n.2 (N.D. Iowa 2007) ("*Kikumura* is no longer good law, insofar as subsequent Supreme Court cases have completely eroded its jurisprudential basis.").

is subject to the equivalent of a nine-level increase[5] based on judge-found facts. *See, e.g.,*
*United States v. Bradford*, 499 F.3d 910, 920 (8th Cir. 2007) (holding twelve-level
enhancement was insufficient to trigger increased burden of proof), *cert. denied*, 128 S.
Ct. 1446 (2008).

## IV. FINDINGS OF FACT

The court found the following facts by a preponderance of the evidence:[6]

In late August of 2006, Luci Dale a/k/a "Lulu" moved to the Sac and Fox Tribe of
the Mississippi in Iowa's Meskwaki Settlement in Tama County, Iowa ("Settlement").
Dale, who was a member of the Omaha Tribe of Nebraska, moved to the Settlement from
Nebraska "to sober up[,] . . . get a job, and settle down." Trial Transcript at 4. Dale,
an alcoholic herself, wanted to get away from alcoholics in her family. Dale knew several
people who lived on the Settlement, including Alex Mauskemo and Monica Papakee
(Defendant's sister). They were Dale's "friends from back in the days." *Id.* at 5.

Dale moved in with Mauskemo and applied for a job at the Meskwaki Bingo Casino
Hotel. Dale managed to stay sober for approximately her first two weeks on the

---

[5] A finding that Defendant is a career offender subjects Defendant to a seven-level
increase to his base offense level (30 to 37) and a two-category increase to his criminal
history category (IV to VI). This is equivalent to an adjusted offense level of 39, Criminal
History Category IV.

[6] As a general matter, the court found Sheila Papakee and Luci Dale to be credible
witnesses. Unlike other witnesses in this case, Sheila Papakee is not an alcoholic and was
not intoxicated or drinking alcohol during the relevant time-period. The court recognizes
that Dale was intoxicated throughout the relevant time-period and unconscious when
sexually assaulted in Defendant's living room. As a consequence, Dale was genuinely
confused at the time of trial as to the timing of many of the events in question. However,
the court found her testimony as to what Defendant and Blackcloud did to her in
Defendant's bedroom to be fully credible.

The court did not find the testimony of Alicia Papakee (Defendant's sister) or
Marland Sanache (Defendant's good friend) to be credible insofar as such testimony
conflicted with the testimony of other witnesses.

Settlement.

In early September of 2006, Monica Papakee introduced Dale to Defendant and Blackcloud a/k/a "Uncle Connie." Shortly thereafter, Dale moved in with Defendant at his residence on the Settlement at 315 Red Earth Drive, Tama County, Iowa.[7] Dale slept in Defendant's bedroom, while he slept on the couch or the floor in the living room. At the time, Blackcloud was also living at Defendant's house.

During the brief period while they lived together, each day Dale, Blackcloud and Defendant drank alcohol until they were intoxicated. Dale drank beer and vodka. Dale also smoked cigarettes when she was drunk.

Blackcloud verbally and physically abused Dale, often in a most brutal fashion. Blackcloud called Dale "a wanna-be white bitch" and told her she did not belong on the Settlement because she was not a Meskwaki. *Id.* at 16. Blackcloud pulled Dale's hair, scratched Dale and repeatedly hit her in the face with a closed fist. For his part, Defendant called Dale a "bitch."

Dale did not fight back "because it wasn't [her] place." *Id.* at 18. When Dale asked Defendant and Blackcloud to stop hurting her, Blackcloud "just laughed" and Defendant "would say he was just playing." *Id.*

On September 4, 2006 (Labor Day), Dale, Blackcloud and Defendant were intoxicated in Defendant's house. Sometime in the morning or early afternoon, Dale passed out or fell asleep on a couch in the living room. Defendant and Blackcloud stripped off Dale's pants and placed a large broken cucumber in her vagina. The cucumber was approximately two inches in diameter and three to four inches long.

Meanwhile, Sheila Papakee (Defendant's cousin) drove to Defendant's house with her children and their bicycles. Sheila Papakee parked her truck and took her children on a walk on a nearby paved trail.

---

[7] This address is now known as 319 Deerfield Crossing, Tama County, Iowa.

Around 1 p.m., Sheila Papakee and her children finished their walk. Sheila Papakee left her children outside and went into Defendant's house. Once inside the house, Sheila Papakee found Defendant, Blackcloud and Dale intoxicated. Defendant and Dale were sitting upright and leaning back on a couch together. Defendant was awake; Dale was passed out and had a blanket covering her waist. Blackcloud was drunk and wandering around the house.

Defendant motioned at Dale and asked Sheila Papakee: "Do you want to check this out?" *Id.* at 230. Before Sheila Papakee could respond, Defendant flipped up the blanket around Dale's waist. Dale was naked at the waist and had a broken cucumber protruding from her vagina.

Sheila Papakee was "shocked." *Id.* at 233. Suddenly, Sheila Papakee and Defendant heard Sheila Papakee's children coming into the house. Defendant re-covered Dale's waist, and Sheila Papakee left the house. Sheila Papakee and her children drove home, which was approximately five minutes away. Sheila Papakee did not call the police because she was "scared." *Id.* at 252.

Once home, Sheila Papakee realized that she had left the children's bicycles at Defendant's house. Around 2 p.m., Sheila Papakee returned to Defendant's house to pick up the bicycles and to check on Dale. Sheila Papakee was worried about Dale. Sheila Papakee loaded the bicycles in her truck and went in the house.

When Sheila Papakee entered Defendant's house for the second time, Defendant, Blackcloud and Dale were all awake, intoxicated and sitting on the couch drinking alcohol. Dale was fully clothed and appeared to be fine. After about ten or fifteen minutes, Sheila Papakee left.

Dale eventually fell asleep in Defendant's bed. Although it was the middle of the day, the shades were drawn and the room was dark.

Sometime thereafter, Defendant and Blackcloud went into the bedroom. Defendant

and Blackcloud turned on the light and woke up Dale. Blackcloud was carrying a large curved cucumber and smoking a cigarette.

Dale was laying on her back in the bed. Defendant put his knees on Dale's shoulders and held Dale down on the bed. Blackcloud then pulled apart Dale's legs and ripped Dale's pajama pants.

Defendant repeatedly head-butted Dale in the face while he was holding her down on the bed. He hit her on the side of her face. Blackcloud whacked Dale upside the head with a glass vodka bottle and hit her with the metal end of a Bic lighter. Blackcloud twice pressed a lit cigarette directly onto Dale's skin—once on Dale's buttock and once on her thigh. Defendant and Blackcloud then pushed the cucumber into Dale's vagina.

Dale drifted in and out of consciousness during the attack, which lasted approximately fifteen to twenty minutes. When conscious, Dale continuously resisted Defendant and Blackcloud; Dale kicked her legs and moved her arms.[8] Blackcloud told Dale to "shut up and take it like a man." *Id.* at 26. Defendant and Blackcloud repeatedly laughed at Dale.

Around 3 p.m., Sheila Papakee entered Defendant's house for a third time.[9] Dale, Defendant and Alicia Papakee (Defendant's sister) were in the bedroom. Blackcloud was walking from the bedroom into the living room.

Sheila Papakee entered the bedroom and found Dale laying on her back on the bed. Defendant and Alicia Papakee were sitting on the sides of the bed. The curtains were still drawn.

---

[8] At no time did Dale consent to having a cucumber in her vagina.

[9] When Sheila Papakee returned home after her second time in Defendant's home, she called Defendant on the telephone and asked how Dale was doing. Defendant did not respond; instead, he gave the phone to Dale. Sheila Papakee asked Dale: "Are you all right? Are you okay?" *Id.* at 277. Dale only cried in response. Concerned, Sheila Papakee decided to return to Defendant's house.

Alicia Papakee was tending to Dale. Alicia Papakee was applying pressure to Dale's forehead with linens, in an attempt to stop Dale from bleeding. Dale bled on a number of linens in the bedroom.

Sheila Papakee ordered Blackcloud to return to the bedroom to help Dale. Sheila Papakee asked Blackcloud: "What the fuck did you hit Dale with?" *See id.* at 247. Blackcloud replied, "My Bic [lighter]." *Id.* Blackcloud lay beside Dale and started putting pressure on her forehead.

Eventually, Dale stopped bleeding. Sheila Papakee escorted Dale out of the house and drove her to her father Rodney Papakee's house. As Sheila Papakee left the house, she saw Defendant pick the broken cucumber off of the living room floor and eat it.

Dale and Sheila Papakee did not immediately report the sexual assault to law enforcement. They were afraid to call law enforcement.

That night, Rita Papakee (one of Defendant's cousins) stayed up all night on a "drunken binge" with two relatives. *Id.* at 133. The three relatives, all intoxicated, drove to Defendant's house on the morning of September 5, 2006. Defendant was out of alcohol, so the three relatives brought him alcohol and started drinking with him in his house.

Later that morning, Rita Papakee drove Defendant to Rodney Papakee's house. Monica Papakee, Sheila Papakee and Dale were there. Sheila Papakee had already told Monica Papakee about what she had seen at Defendant's house the previous day. Rita Papakee saw a laceration on Dale's head.

Monica Papakee and Sheila Papakee told Rita Papakee what Sheila Papakee had seen at Defendant's house the previous day. Dale confirmed that "they" had "used a cucumber on me" "front and back" *Id.* at 128-29. Rita Papakee, who was "outraged" and found the allegations "disturbing and disgusting," decided to confront Defendant. *Id.* at 110.

An intoxicated Rita Papakee asked Defendant: "What the fuck did you do? What

the fuck's the matter with you?" *Id.* at 110.  Defendant did not deny or confirm sexually assaulting Dale.  Defendant simply responded: "Why are you yelling at me? . . . [W]hat is she to you?  What does it matter to you?" *Id.* at 110-11.  Rita Papakee asked Defendant: "How would you feel if somebody did that to your daughter?" *Id.* at 111. Defendant responded: "You don't even know this woman.  What does it matter?" *Id.*

   Still intoxicated, Rita Papakee decided to confront Blackcloud.  Rita Papakee found Blackcloud at Blackcloud's sister's house and asked Blackcloud what she did to Dale and "what the fuck was the matter with [Blackcloud]." *Id.* at 114.  She asked: "And you guys used a fucking cucumber on her?" *Id.*  Blackcloud laughed and replied: "Yeah, I did use a cucumber on her." *Id.*  Rita Papakee then punched Blackcloud in the face.  Blackcloud just laughed.

On September 6, 2006, Tama County Deputy Sheriff Wesley Sebetka ("Deputy Sebetka") received a call from dispatch that there was a report of a sexual assault on the Settlement.  Deputy Sebetka went to Rodney Papakee's residence, where he met Dale. Dale was intoxicated and laying in bed.  She had scratches, cuts on her head and multiple bruises over her body.  Dale did not want to talk about a sexual assault, although she mentioned she had a "scuffle" with Defendant. *Id.* at 410.  Dale later left the Settlement on a bus towards Omaha, Nebraska.

On September 8, 2006, FBI Agent Jason Amoriell ("Agent Amoriell") received a call from Roger Sanders, Chief of the Meskwaki Nation Police Department, about an alleged assault at Defendant's residence.  Shortly thereafter, Agent Amoriell met with members of the Tama County Sheriff's Department and the Meskwaki Nation Police Department.  Together, they obtained a warrant to search Defendant's home for evidence of a sexual assault.[10]  Agent Amoriell recovered bloody linens from the home.  DNA on

---

[10] A more complete version of the events leading to the execution of a warrant at

(continued…)

the linens matched Dale's DNA. Agent Amoriell also saw cucumber peels in the trash can in Defendant's kitchen.

Also on September 8, 2006, Kristen Hammes ("Nurse Hammes"), a registered nurse and trained "Sexual Assault Nurse Examiner," examined Dale in a hospital in Omaha, Nebraska. Dale told Nurse Hammes that "she had a bottle/glass broken on her head by [Blackcloud] while [Defendant] assaulted her sexually." *Id.* at 159. Dale also stated that she was vaginally penetrated with a cucumber while resisting.

Nurse Hammes observed bruises, lacerations and cigarette burns on Dale's body. Nurse Hammes took photographs of Dale's injuries and found that they were consistent with Dale's allegations. *See* Gov't Exs. 8-13. Nurse Hammes also made a formal report. *See* Def. Blackcloud Ex. C. Nurse Hammes did not observe any injuries to Dale's vaginal area, but testified as an expert that the lack of such injuries was not necessarily inconsistent with Dale's allegations of sexual assault.

## V. ADVISORY SENTENCING GUIDELINES RANGE

At the Hearing, the court ruled upon two advisory Sentencing Guidelines issues. The court decided (1) whether a four-level increase is appropriate, pursuant to USSG §2A3.1(b)(1) (2007),[11] because Defendant caused or attempted to cause Dale to engage in a sexual act by using force against her; and (2) whether Defendant is a career offender under USSG §4B1.1.

### A. Base Offense Level—USSG §2A3.1(a)(2)

The jury convicted Defendant of Sexual Abuse, in violation of 18 U.S.C. § 2242(2). Accordingly, Defendant's base offense level was **30**, pursuant to USSG §2A3.1(a)(2). *See*

---

[10](…continued)
Defendant's home may be found at *United States v. Papakee*, No. 06-CR-162, 2007 WL 891717 (N.D. Iowa Mar. 21, 2007).

[11] The parties agree that the 2007 edition of the Sentencing Guidelines manual applies. *See* PSIR at ¶ 17.

USSG App. A (stating that convictions under §2242 are judged under USSG §2A3.1).

### B. Use of Force—USSG §2A3.1(a)(2)

Section 2A3.1(a)(2) provides for a four-level increase "[i]f the offense involved conduct described in 18 U.S.C. § 2241(a) or (b) . . . ." USSG §2A3.1(a)(2). As applied to the facts of this case, Defendant was subject to this four-level increase if he caused Dale to engage in a sexual act by use of force. That is, Defendant was subject to the sentencing enhancement if the court found by a preponderance of the evidence that he was guilty of Aggravated Sexual Abuse.

Based upon the facts that the court found in Part IV *supra*, a four-level adjustment was clearly appropriate. Defendant repeatedly used force against Dale, in order to cause her to engage in a sexual act. Put simply, Defendant brutalized Dale in a sadistic attempt to rape her with a vegetable.

This brought Defendant's adjusted offense level to **34**.

### C. Career Offender—USSG §4B1.1

As applied here, the advisory Sentencing Guidelines provide that Defendant's adjusted offense level should be increased to 37 and his Criminal History Category becomes VI if he is a "career offender." *See* USSG §4B1.1(b)(A) (provision where statutory maximum for the offense of conviction is life). Defendant is a career offender if:

> (1) [he] was at least eighteen years old at the time [he] committed the instant offense of conviction; (2) the instant offense of conviction is a felony that is either a crime of violence or a controlled substance offense; and (3) [he] has at least two prior felony convictions of either a crime of violence or a controlled substance offense.

*Id.* §4B1.1(a). At the Hearing, the court found that all three prongs of §4B1.1(a) were met and thus held that Defendant is a career offender.

### 1. Defendant was eighteen years old at time of instant offense of conviction

First, it is undisputed that Defendant was at least eighteen years old at the time he committed the instant offense of conviction, Sexual Abuse in Indian Country. Defendant was thirty-four-years old in September of 2006.

### 2. Instant offense of conviction is a felony and a "crime of violence"

Second, Sexual Abuse in Indian Country is a felony that is a crime of violence. It is undisputed that Sexual Abuse in Indian Country is punishable by life imprisonment and is thus a felony. 18 U.S.C. § 2242. However, Defendant argued that Sexual Abuse in Indian County is not a "crime of violence," because (1) "force" is not an element of Sexual Abuse in Indian Country; (2) the Commentary to § 4B1.2 explicitly lists "forcible sex offenses" but not "nonforcible sex offenses"; and (3) Sexual Abuse in Indian Country does not involve conduct that presents a serious potential risk of physical injury to another. The gist of Defendant's argument is that, because the victim in a Sexual Abuse in Indian Country case is always unconscious or otherwise unable to resist, there is neither the use of physical force nor any danger of injury.

The court found Defendant's arguments lacked merit.

> The term "crime of violence" means any offense under federal or state law, punishable by imprisonment for a term exceeding one year, that—
>
> (1) has as an element the use, attempted use, or threatened use of physical force against the person of another, or
>
> (2) is burglary of a dwelling, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another.

USSG §4B1.2. Although the court cannot find any cases precisely on point, the Ninth Circuit Court of Appeals has examined a very similar Louisiana statute called "simple

rape"[12] and held it met the foregoing definition of "crime of violence." The Ninth Circuit Court of Appeals reasoned:

> Personal contact is, of course, part and parcel of simple rape or its attempt. . . . [N]o matter how committed, every time a perpetrator engages in or attempts to engage in an act of rape, some contact with the victim is achieved. Such close proximity coupled with the nature of this offense creates an atmosphere that fosters the potential for physical confrontation. Even in its least violent form, simple rape . . . could result in physical injury to the victim.
>
> For example, if the victim . . . came out of her stupor, the

---

[12] **A.** Simple rape is a rape committed when the anal or vaginal sexual intercourse is deemed to be without the lawful consent of a victim who is not the spouse of the offender because it is committed under any one or more of the following circumstances: **(1)** When the victim is incapable of resisting or of understanding the nature of the act by reason of a stupor or abnormal condition of mind produced by an intoxicating agent or any cause, other than the administration by the offender, and without the knowledge of the victim, of any narcotic or anesthetic agent or other controlled dangerous substance and the offender knew or should have known of the victim's incapacity. **(2)** When the victim is incapable, through unsoundness of mind, whether temporary or permanent, of understanding the nature of the act and the offender knew or should have know of the victim's incapacity. **(3)** When the female victim submits under the belief that the person committing the act is her husband and such belief is intentionally induced by any artifice, pretense, or concealment practiced by the offender . . . . **B.** Whoever commits the crime of simple rape shall be imprisoned, with or without hard labor, without the benefit of parole, probation, or suspension of sentence, for not more than twenty-five years.

La. Rev. Stat. Ann. § 14:43 (West 1998) (emphasis added) (quoted in *United States v. Riley*, 183 F.3d 1155, 1157 (9th Cir. 1999)).

situation could easily escalate into a violent confrontation. While every episode of simple rape may not result in physical injury to the victim, the guideline only requires that there be a serious potential risk of physical injury, not that the injury in fact occur.

Riley argues that simple rape is not a crime of violence because it is merely sex by trickery, deceit, or negligence rather than by force. . . . By definition, simple rape can be achieved by trickery or deception. It is nonetheless a crime against the bodily integrity of the victim. That deception may be used to effect the rape does not erase the ever-present possibility that the victim may figure out what's really going on and decide to resist, in turn requiring the perpetrator to resort to actual physical restraint. Further, rape also subjects the victim to the physical risks associated with sexually transmitted diseases and pregnancy. As such, it creates a serious potential risk of physical injury and is therefore a crime of violence under USSG § 4B1.2(a)(2).

Riley attempts to characterize this crime as nonviolent because the victim may initially consent to the sexual encounter but lack the legal capacity to do so. However, we refuse to minimize a crime solely because its victim may be helpless. The Guidelines in fact provide an enhancement for crimes committed against such "vulnerable victims." Moreover, we recently observed that sex crimes committed against the vulnerable, such as an unconscious or intoxicated individual, are particularly egregious and dehumanizing.

*United States v. Riley*, 183 F.3d 1155, 1157-60 (9th Cir. 1999) (citations, internal quotation marks and footnotes omitted). In a footnote, the court expressly rejected the argument that the United States Sentencing Commission's decision to list "forcible sex offenses" somehow precludes a finding that "simple rape" is a "crime of violence." The Ninth Circuit Court of Appeals observed:

Riley contends that finding attempted simple rape a crime of violence, gives short shrift to the Commentary to USSG

§4B1.2, specifically that portion referring to "forcible sex offenses." However, the Commentary states that other crimes not specifically listed but that involve serious risk of physical injury are considered violent. While all forcible sex offenses are crimes of violence[,] it does not follow that no nonforcible ones are. Many states still criminalize a host of adult nonforcible sex offenses that could not plausibly be thought crimes of violence. Thus, our determination that attempted simple rape is a crime of violence by no means renders the term "forcible" superfluous.

*Id.* at 1160 n.13 (citations, internal quotation marks and footnotes omitted). The court agrees with the foregoing analysis and adopts it in full. Sexual Abuse in Indian Country is a "crime of violence." USSG § 4B1.2; *see also United States v. Austin*, 426 F.3d 1266, 1280 (10th Cir. 2005) (holding state statute that criminalized non-forcible statutory rape was a crime of violence), *cert. denied*, 546 U.S. 1194 (2006).

The court's conclusion is not inconsistent with the Supreme Court's recent decision in *Begay v. United States*, 2008 WL 1733270 (U.S. Apr. 16, 2008). In *Begay*, the Supreme Court held that a prior felony conviction for drunk driving under a New Mexico state statute, N.M. Stat. Ann. §§ 66-8-102(A) *et seq.*,[13] was not a "violent felony" for purposes of the Armed Career Criminal Act ("ACCA"), 18 U.S.C. § 924(e). 2008 WL 1733270, at *7. *Begay* is important for present purposes, because the definitions of "violent felony" in the ACCA and "crime of violence" in §§4B1.1(a) and .2 are nearly identical and generally interpreted as coextensive. *See, e.g., United States v. Doe*, 960 F.2d 221, 225 (1st Cir. 1992) (Breyer, C.J.).

In holding that a conviction under such statute is not a "violent felony," the Supreme Court "consider[ed] the offense generically, that is . . . [,] in terms of how the

---

[13] The New Mexico statute criminalizes the operation of a motor vehicle under the influence of alcohol or with a blood alcohol concentration of .08 or more. N.M. Stat. Ann. §§ 66-8-102(A), (C).

law defines the offense and not in terms of how an individual offender might have committed it on a particular occasion." *Begay*, 2008 WL 1733270, at *3 (citing *Taylor v. United States*, 495 U.S. 575, 602 (1990) and *James v. United States*, 127 S. Ct. 1586, 1597 (2005)). The court did not dispute that drunk driving "involves conduct that 'presents a serious potential risk of physical injury to another.'" *Id.* at *4. The court nonetheless held that the defendant's drunk driving conviction was not a "violent felony," because it was "simply too unlike the provision's listed examples [of burglary, arson, extortion or crimes involving the use of explosives] . . . to believe that Congress intended the provision to cover it." *Id.* These listed examples immediately precede the "presents . . . another" clause in the ACCA. 18 U.S.C. § 924(e).

The Supreme Court held that the presence of the listed examples in the ACCA "indicates that the statute covers only *similar* crimes, rather than *every* crime that 'presents a serious potential risk of physical injury to another.'" *Begay*, 2008 WL 1733270, at *4 (emphasis in original) (quoting 18 U.S.C. § 924(e)(2)(B)(ii)). To qualify, then, a crime must not only "present a serious potential risk of physical injury to another," 18 U.S.C. § 924(e), but must also be "roughly similar, in kind as well as in degree of risk posed, to the examples [of burglary, arson, extortion or crimes involving the use of explosives] themselves." *Begay*, 2008 WL 1733270, at *4 (citing *Duncan v. Walker*, 533 U.S. 167, 174 (2001)).

The Supreme Court held that drunk driving was not roughly similar, in kind as well as in degree of risk posed, to burglary, arson, extortion and crimes involving the use of explosives. The court reasoned:

> [Drunk driving] differs from the example crimes—burglary, arson, extortion, and crimes involving the use of explosives—in at least one pertinent, and important, respect. The listed crimes all typically involve purposeful, "violent," and "aggressive" conduct. That conduct is such that it makes more likely that an offender, later possessing a gun, will use

that gun deliberately to harm a victim. Crimes committed in such a purposeful, violent, and aggressive manner are "potentially more dangerous when firearms are involved." And such crimes are "characteristic of the armed career criminal, the eponym of the statute."

By way of contrast, [drunk driving statutes], such as the statute before us, typically do not insist on purposeful, violent, and aggressive conduct; rather, they are, or are most nearly comparable to, crimes that impose strict liability, criminalizing conduct in respect to which the offender need not have had any criminal intent at all. The Government argues that "the knowing nature of the conduct that produces intoxication combined with the inherent recklessness of the ensuing conduct more than suffices" to create an element of intent. And we agree with the Government that a drunk driver may very well drink on purpose. But this Court has said that, unlike the example crimes, the conduct for which the drunk driver is convicted (driving under the influence) need not be purposeful or deliberate.

*Id.* at *6 (citations omitted).

In sum, *Begay* mandates a two-part inquiry. First, the court must find that the potentially qualifying conviction "involves conduct that presents a serious potential risk of physical injury" to another. Second, the court must determine whether such conviction is "roughly similar, in kind as well as in degree of risk posed, to the examples" listed immediately prior to the phrase "involves conduct that presents a serious potential risk of physical injury to another." *Begay*, 2008 WL 1733270, at *4-6.

As the court's discussion of *Riley* makes clear, the court finds that Sexual Abuse in Indian Country clearly "involves conduct that presents a serious potential risk of physical injury" to another. Applying *Begay*, then, the pivotal inquiry is whether Sexual Abuse in Indian Country is "roughly similar, in kind as well as in degree of risk posed, to the examples" listed in §4B1.2. *Begay*, 2008 WL 1733270, at *4. The examples listed in

§4B1.2 are burglary of a dwelling,[14] arson, extortion and crimes involving the use of explosives.  USSG §4B1.2.

The court holds that Sexual Abuse in Indian Country is sufficiently similar to burglary of a dwelling, arson, extortion and crimes involving the use of explosives. Sexual Abuse in Indian Country, that is, raping a person who is unable to resist or incapable of apprising the nature of the sexual contact in Indian Country, "typically involve[s] purposeful, 'violent,' and 'aggressive' conduct." *Begay*, 2008 WL 1733270, *6.  Further, Sexual Abuse in Indian Country is potentially more dangerous when firearms are involved.  *See id.*  If the victim were to wake from her stupor or come to fully apprise the nature of the defendant's actions, the defendant could murder his victim to cover up his crime.  Simply put, Sexual Abuse in Indian Country is a far cry from the drunk driving statute at issue in *Begay* or crimes that "impose strict liability, criminalizing conduct in respect to which the offender need not have had any criminal intent at all." *Id.*

Accordingly, the court holds that the instant offense of Sexual Abuse in Indian Country is a felony that is a crime of violence.

### 3.    *Defendant has two prior convictions for felonies that are crimes of violence*

Third, Defendant concedes that he has at least two prior felony convictions for crimes of violence.  In 1994, Defendant was convicted of Assault with Intent to Commit Sexual Abuse, in violation of Iowa Code section 709.11 (1993).  *See* PSIR at ¶ 31; *see United States v. Marcos-Quiroga*, 478 F. Supp. 2d 1114, 1124 (N.D. Iowa 2007) (Bennett, J.) (holding that Assault with Intent to Commit Sexual Abuse qualifies as a "crime of violence" for purposes of §4B1.1).  In 2000, Defendant was convicted of Aggravated Assault, in violation of Iowa Code sections 708.1 and .2(1) (1999).  *See* PSIR at ¶ 34; *see, e.g., United States v. Thomas*, 832 F. Supp. 1297, 1304 (N.D. Iowa 1993) (Hansen, J.)

---

[14]    Whereas the ACCA lists "burglary," §4B1.2 substitutes "burglary of a dwelling."

(holding that Aggravated Assault qualifies as a "crime of violence" for purposes of §4B1.1).

### 4. Conclusion that Defendant is a career offender

Accordingly, the court held that Defendant is a career offender. This brought Defendant's total offense level under the advisory Sentencing Guidelines to **37**.

## D. Criminal History Category

Absent a finding that Defendant is a career offender, it was undisputed that he would be a **Criminal History Category IV**. Because Defendant is a career offender, he is a **Criminal History Category VI**. USSG §4B1.1(b).

## E. Advisory Sentencing Guidelines Range

Defendant's total offense level was **37**, and he was a **Criminal History Category VI**. No traditional departures were warranted. Accordingly, the court found that Defendant's advisory Sentencing Guidelines range was **360 months to life imprisonment**. *See* USSG Sentencing Table.

## VI. SENTENCE

After considering all of the factors at 18 U.S.C. § 3553(a), the court found that a sentence of 360 months of imprisonment was appropriate. The court denied Defendant's motion for a downward variance from the advisory Sentencing Guidelines range, because a sentence below the advisory Sentencing Guidelines range of 360 months to life imprisonment would run afoul of the § 3553(a) factors. *See also* Part VII infra (discussing reasons for alternative variance).

## VII. ALTERNATIVE VARIANCE

In the event that the court erred in finding that Defendant is a career offender, it is undisputed that his total offense level would be 34 and he would be a Criminal History Category IV. Accordingly, were Defendant not a career offender, Defendant's advisory Sentencing Guidelines range would be 210 to 262 months of imprisonment.

Even if Defendant were not a career offender, however, after considering all of the § 3553(a) factors the court would vary upward and still impose a sentence of 360 months of imprisonment. The court recognizes that the Eighth Circuit Court of Appeals has previously held that such alternative variances sometimes will not survive appellate scrutiny. *See, e.g., United States v. Bah*, 439 F.3d 423, 430-32 (8th Cir. 2006). *Bah* is distinguishable from the present case, however, because here the court is basing its alternative variance upon a specific, identifiable alternative range and has not imposed a "blanket identical alternative sentence." *Cf. Bah*, 439 F.3d at 431 (criticizing the district court for imposing a "blanket identical alternative sentence," because it "effectively ha[d] ignored the requirement . . .to first determine the appropriate guidelines sentencing range for the alternative sentence" (citations and internal quotation marks omitted)). In other words, there is a meaningful difference between identifying an alternative variance from a specific alternative advisory Sentencing Guidelines range and announcing an alternative sentence whatever the advisory Sentencing Guidelines range might be. In the former instance, the advisory Sentencing Guidelines retain their status as "the starting point and the initial benchmark," *Gall*, 128 S. Ct. at 596-97, and there is no danger that the district court has wholly ignored the advisory Sentencing Guidelines. In any event, the continuing viability of *Bah* is highly questionable in light of *Gall* and intervening decisions of the Eighth Circuit Court of Appeals. *See, e.g., United States v. Freemont*, 513 F.3d 884, 890-91 (8th Cir. 2008) (considering two alternative variances on the merits in a post-*Gall* appeal).

When the court considers all of the § 3553(a) factors, the reasons for a sentence of 360 months of imprisonment are clear. A jury found Defendant guilty of a serious offense, Sexual Abuse in Indian Country. The facts and circumstances of the abuse were particularly aggravating, as the court's factual findings in Part IV *supra* show. Defendant and Blackcloud physically and sexually abused an adult female. The sexual abuse involved

the use of a cucumber, which was inserted into the vaginal opening of the victim. The victim was so intoxicated that she could not resist and she was conscious only periodically during the commission of the sexual acts.

Defendant is a dangerous man. He has repeatedly engaged in crimes of violence in his relatively short life. These crimes of violence include Assault Causing Injury, in violation of Iowa Code sections 708.1 and .2(2) (1993), *see* PSIR at ¶ 30; Assault with Intent to Commit Sexual Abuse, in violation of Iowa Code section 709.11 (1993), *see* PSIR at ¶ 31; and Aggravated Assault, in violation of Iowa Code sections 708.1 and .2(1) (1999), *see* PSIR at ¶ 34. The facts of the latter two crimes of violence show a pattern of violent conduct toward females and the vulnerable.

The Assault with Intent to Commit Sexual Abuse occurred while the victim, a fifteen-year old girl, was asleep at Defendant's residence. PSIR at ¶ 31. Defendant pulled down the child's shorts, placed his hand in her underwear and tried to put his finger into her vagina. *Id.* The child awoke as Defendant tried to penetrate her vagina. *Id.*[15]

The Aggravated Assault occurred when Defendant and a female entered a residence without permission and attacked two sleeping victims. Defendant held down a female victim, while he and his accomplice repeatedly struck her. Defendant shouted "Fuck you, bitch." PSIR at ¶ 34. Defendant beat the victim so hard that her "nose was extremely disfigured and her upper front tooth was broken." *Id.*

---

[15] At trial, the court excluded evidence of Defendant's 1994 conviction, pursuant to Federal Rule of Evidence 403. *See United States v. Papakee*, No. 06-CR-162-LRR, 2007 WL 1058471, *5 (N.D. Iowa Apr. 5, 2007). At the time, the court did not know that the facts underlying such conviction were similar to the instant offense of conviction. *See id.* at *3 ("There is no evidence in the record that indicates that the conduct underlying the 1994 [c]onviction was similar to the alleged conduct underlying the Superseding Indictment."). The government made no attempt to prove the facts underlying the 1994 conviction in the present matter; the USPO brought the facts to the court's attention in its investigation of Defendant's criminal history. Defendant did not object to the relevant portions of the PSIR.

Based on Defendant's conduct in this case and his history of violence toward others, the court finds he is dangerous and is at a high risk to re-offend—likely by causing physical harm to others. Without a career offender finding, Defendant's advisory Sentencing Guidelines range would substantially under-represent his criminal history and the likelihood he will re-offend.

Three serious offenses were not scored under the advisory Sentencing Guidelines, because they were committed some time ago. Specifically, the advisory Sentencing Guidelines did not score (1) Defendant's 1992 conviction for Operating While Intoxicated—First Offense, in violation of Iowa Code section 321J.2 (1991), *see* PSIR at ¶ 29; (2) Defendant's 1994 conviction for Assault Causing Injury, in violation of Iowa Code sections 708.1 and .2(2) (1993), *see* PSIR at ¶ 30; and Defendant's 1996 conviction for Operating While Intoxicated—Second Offense, in violation of Iowa Code section 321.J.2 (1995), *see* PSIR at ¶ 32.

Even though the Supreme Court has recently held that drunk driving is technically not a "violent felony" for purposes of the ACCA, drunk driving remains a very serious offense. Drunk driving poses a great risk of harm to innocent members of the public and law enforcement. As the majority of the Supreme Court stated, "[d]runk driving is an extremely dangerous crime." *Begay*, 2008 WL 1733270, at *4. "In the United States in 2006, alcohol-related motor vehicle crashes claimed the lives of more than 17,000 individuals and harmed untold amounts of property." *Id.* (citation omitted). The dissent agreed with this assessment. The dissent pointed out:

> Statistics dramatically show that driving under the influence of alcohol is very dangerous. Each year, approximately 15,000 fatal alcohol-related crashes occur, accounting for roughly 40% of all fatal crashes. Approximately a quarter million people are injured annually in alcohol-related crashes. The number of people who are killed each year by drunk drivers is far greater than the number of murders committed during. . . . burglary, arson, extortion, and offenses involving the use of

explosives.

*Id.* at *13 (Alito, J., dissenting) (footnotes omitted).

Accordingly, if the court erred in its calculation of Defendant's advisory Sentencing Guidelines range and Defendant's properly calculated range is 210 to 262 months of imprisonment, the court would nonetheless vary upward and impose a sentence of 360 months of imprisonment. The court so found after considering all of the § 3553(a) factors.

## VIII. DISPOSITION

After all applicable adjustments, the court found that Defendant's total offense level was **37**. The court also found that Defendant was a **Criminal History Category VI**. Accordingly, the court found that Defendant's advisory Sentencing Guidelines range was **360 months to life imprisonment**. *See* USSG Sentencing Table. After considering all of the factors at 18 U.S.C. § 3553(a), the court found that a sentence of 360 months of imprisonment was appropriate.

**IT IS SO ORDERED.**

**DATED** this 24th day of April, 2008.

LINDA R. READE
CHIEF JUDGE, U.S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA